**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

NICK HARVEY, CINDY STURTZ and
DAVID AUSBORN, Individually and on
behalf of all others similarly situated,

           Plaintiffs,

vs.

AB ELECTROLUX, ELECTROLUX
HOME PRODUCTS, INC.,
ELECTROLUX HOME PRODUCTS OF
NORTH AMERICA n/k/a
ELECTROLUX MAJOR APPLIANCES
NORTH AMERICA, and ELECTROLUX
HOME CARE PRODUCTS, INC.,

           Defendants.

No. C11-3036-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PARTIES'
MOTIONS FOR PARTIAL
SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

**I.   INTRODUCTION AND BACKGROUND**.................................................. 2
   **A.   Factual Background** ................................................................ 2
   **B.   Procedural Background** ......................................................... 9

**II.  LEGAL ANALYSIS** ................................................................... 11
   **A.   Summary Judgment Standards**............................................ 11
   **B.   Overview Of The FLSA**........................................................ 12
   **C.   Analysis Of Plaintiffs' Donning Claims**.................................. 15
       **1.   Section § 203(o)** ...................................................... 15
       **2.   Does plaintiffs' conduct constitute changing clothes?** ........... 20
       **3.   Custom or practice** ..................................................... 21
   **D.   Analysis Of Plaintiffs' Walking Claims** .................................. 25
   **E.   Analysis Of Plaintiffs' Washing Claims**.................................. 29
       **1.   Legal framework** ....................................................... 29
       **2.   Whether the activities were required by Electrolux** ................. 32

|       | 3.  | Whether the activities were necessary for the employee to perform his or her duties | 32 |
|       | 4.  | Whether the activities primarily benefit Electrolux | 33 |
| F.    | Analysis Of Plaintiffs' IWPCL Claims | | 34 |
|       | 1.  | Overview of the IWPCL | 34 |
|       | 2.  | Analysis | 35 |

III.   CONCLUSION ............................................................ 36

Plaintiffs have brought claims on behalf of hourly employees at defendants' former laundry appliances plant in Webster City, Iowa. Plaintiffs claim that defendants' failure to compensate them for the time they spent donning personal protective equipment ("PPE"), walking to their work stations after donning their PPE, and washing their gloves and arm guards at home violates the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 1 *et seq.* and the Iowa Wage Payment and Collection Law ("IWPCL"), IOWA CODE § 91A.1 *et seq.* The parties have each moved for partial summary judgment, requiring me to decide, *inter alia*, whether donning workers' personal protective equipment is "changing clothes" under the FSLA, 29 U.S.C. § 203(o).

## I.     INTRODUCTION AND BACKGROUND

### A.     Factual Background

I set out only those facts, disputed and undisputed, sufficient to put in context the parties' arguments concerning the parties' motions for partial summary judgment. At

2

least for the purposes of summary judgment, the facts recited here are undisputed. I will discuss additional factual allegations, and the extent to which they are or are not disputed or material, if necessary, in my legal analysis.

Until March 31, 2011, Electrolux Home Products, Inc. ("Electrolux") operated a laundry appliances plant in Webster City, Iowa, that manufactured washers, dryers, and laundry centers ("the plant"). The plant operated continuously for several decades and closed permanently on March 31, 2011. Electrolux employed approximately 1,800 hourly production workers at the plant. Approximately 1,200 of these employees held assembly positions with the remaining 600 in support positions. There were five assembly or production lines at the plant and the following twelve support departments: fabrication, final pack, plastics, press, paint, tool and die, maintenance, receiving and materials, service, next level washer fabrication, alliance fabrication, and receiving quality and assurance.

The plant was unionized and employees were represented by Local 442 of the United Automobile, Aerospace and Agricultural Implement Workers of America ("Local 442"). Collective bargaining agreements between Electrolux and Local 442 concerning the plant existed for 50 years. The most recent collective bargaining agreement was executed in June 2008.

Electrolux trained its employees on its timekeeping practices. Electrolux had an electronic badge swipe system which production workers used to "clock in" and "clock out." Electrolux's management accessed daily the computerized badge swipe times of its employees. The first shift of the production line started at 6:30 a.m.[1] Electrolux ran multiple shifts in the various departments daily. Electrolux prohibited employees from clocking in more than 15 minutes before the start of their shifts.

---

[1]Support departments started at various times.

Electrolux implemented a work rule in July 2007 requiring hourly production workers to wear gloves and arm guards in all working areas of the plant. The purpose of the gloves and arm guards was to protect employees from potential injuries. Before that, PPE requirements had been decided on a job-by-job basis except that all hourly production workers were required to wear safety glasses. The purpose of the safety glasses was to protect employees from injury. Electrolux required that employees have their safety glasses on as soon as they entered the plant. Generally, employees were required to have their gloves and arm guards on at the start of their shifts.

Many employees were already required to wear gloves prior to July 2007. The gloves and arm guards were made of knit synthetic fabric, and the safety glasses were plastic. Employees in certain other departments were required to wear additional PPE. The other types of PPE were worn on a department by department, job by job, or task by task basis.[2] For example, some employees, such as drum seamers and other employees who welded, were required to wear aprons. Electrolux required aprons to protect employees from potential cuts from raw edges. Aprons took no more than 30 seconds to put on. Aprons were generally kept in employee lockers or work stations. Some employees may have chosen to wear aprons either to allow them to wear shorts or to keep their clothing clean.[3]

Some assembly work stations required employees to wear foam disposable ear plugs. The ear plugs were intended to protect employees' eardrums in certain high noise level areas of the plant. For example, employees in the press department were required

---

[2]Any additional PPE that had to be donned well into the shift would have been located at the specific work stations.

[3]Some assembly work stations required employees to wear long pants instead of shorts or a skirt. Other stations allowed employees to wear long pants or shorts with an apron.

to wear ear plugs because of the noise level in that department. Employees performing particular jobs within their support departments, such as certain employees in alliance fabrication or washer fabrication, also wore ear plugs. Other employees working near loud machines may have chosen to wear ear plugs. The ear plugs took about 30 seconds to put in. Since they were disposable, employees wore a fresh pair of ear plugs each day. Employees could obtain ear plugs from utility workers or forepersons. Employees often kept multiple pairs of ear plugs so that they could come to work in the morning with their earplugs already. Most employees who wore ear plugs donned them at their work stations. Employees who wore aprons and/or ear plugs generally were required to have those on at the start of their shifts.

Employees in maintenance, tool and die, and certain employees in plastics, paint, and fabrication wore uniforms they received from Electrolux. They were each issued a number of uniforms. Employees who wore uniforms provided by Electrolux were permitted to take them home and don them there. Electrolux also generally required employees to wear hard-soled shoes that were not canvas or open. Some employees elected to wear steel-toed shoes or boots, but it was not required. No employees at the plant wore rubber suits.

Employees in the receiving department had to wear a face shield while filling batteries. Employees in press had to wear face shields when operating the grinder. Employees in maintenance and tool and die also wore face shields for certain tasks. The face shields were kept immediately next to the workstation. Employees in the paint department were required to wear respirators when they were working in paint booths or mixing paint. Respirators were generally kept in employee lockers and retrieved as needed during the shift. Paint department employees also occasionally could elect to wear painter's nuisance masks for certain tasks. Employees in the paint department working in the paint booths were also required to wear paper suits and rubber boots to

protect their clothing and shoes from being damaged. Employees in the paint department and the press department who cleaned out waste water also wore rubber boots because of the substances in the water. Electrolux required face shields, respirators, and rubber boots for waste water for employee safety. The paper suits and rubber boots worn by paint department employees and any employee uniforms were solely for the purpose of keeping employees' clothing and shoes clean.

Certain employees were required to have their gloves and arm guards on before starting their shifts. Employees could put on their safety glasses, gloves, and arm guards before entering the plant, or at home if they chose. Some employees stored their PPE in their lockers. There was no requirement that employees store their PPE in lockers, but they could store it there if they wished. Employees also could take their PPE home rather than storing it in their lockers. Some employees who stored their PPE in their lockers sometimes retrieved their PPE from their lockers before arriving at their workstations at the start of their shift, and sometimes returned their PPE to their lockers after the end of their shift.

The practice at the plant was not to pay employees for time spent putting on gloves, arm guards, and safety glasses before their shift. The collective bargaining agreement contains no reference to donning and doffing, clothes changing, or PPE maintenance. Nothing in the collective bargaining agreement required that employees be paid for time spent putting on gloves, arm guards, and safety glasses before their shift. It was also the practice at the plant to not pay employees for time spent washing gloves or arm guards at home if they chose to do so. Electrolux did not require employees to wash their gloves or arm guards.

Electrolux consented to a request that employees be permitted to bring their gloves and arm guards home and independently maintain them. Employees were permitted to personalize their arm guards. In July 2007, Local 442 filed a grievance over whether or

not Electrolux should be washing gloves and arm guards for employees. Following discussions between Electrolux and Local 442, Electrolux agreed to offer a cleaning service to wash the gloves and arm guards for employees. If employees wanted their gloves and arm guards washed, they could turn in their dirty gloves and arm guards, and pick up washed gloves and arm guards at the plant.[4] Some employees did not believe that the cleaning service did a good enough job cleaning the gloves and arm guards and some employees washed their gloves and arm guards at home on their own.

It took plaintiff Nick Harvey less than one minute to put on gloves, arm guards, and safety glasses. Harvey also wore green foam earplugs. Harvey could not estimate how long it took him to put in the earplugs. Other than gloves, arm guards, and safety glasses, plaintiff David Ausborn did not wear any other PPE. It took Ausborn approximately two minutes to put on his gloves and arm guards. Plaintiff Cindy Sturtz also wore an apron to protect her when she worked in the paint department, but only when she wore shorts to work. She sometimes had trouble finding the apron, but it still took her just a couple of minutes to find her apron and put it on. It took between 2 to 4 minutes for most of the plaintiffs to walk to their workstations. Plaintiffs spent the following cumulative amounts of time donning and walking to their work stations each day: Harvey, 2-4 minutes; Sturtz, 5 minutes; Ausborn, 4-7 minutes.

Employee lockers were located at various places in the plant. There were no formal locker assignments and some employees had lockers while others did not. Some, but not all, lockers were close to employees' work stations. For example, Cindy Sturtz's locker was on the other side of her department, while Nick Harvey's locker was right next to his work area. Ausborn's locker was right by his work area when he was on the alliance line, but halfway across the plant when he was on the next level washer line.

_____

[4] Electrolux also washed the uniforms worn by employees in the maintenance and tool and die departments.

Some employees who had lockers chose to don their gloves and arm guards at their lockers. Some employees without lockers donned their gloves and arm guards at their workstations. Other employees, who had lockers, still chose to don their gloves and arm guards at their workstations because they preferred to do it there. Some employees donned some of their PPE at home while other employees put on their gloves and arm guards around the time clock which was just inside the plant entrance.

Electrolux's consistent practice for over thirty years was not to pay employees for the time spent putting on PPE, including, but not limited to, gloves, arm guards, and safety glasses. Local 442 filed hundreds of grievances during the period from August 3, 2008, through March 31, 2011.[5] During that period, Local 442 never filed a grievance seeking pay for time employees spent donning PPE.

Electrolux never required employees to wash their gloves or arm guards or to keep them at any particular level of cleanliness. Harvey washed his arm guards and gloves twice a week, and it took him five minutes to load them into the washer and two to three minutes to load them into the dryer. If his gloves and arm guards were heavily soiled, Harvey had to wash them twice. Sturtz washed her gloves and arm guards once or twice a week. Although she was unsure of the exact time involved, Sturtz estimated that it took her two and one-half minutes to walk from the upstairs of her home to her basement and put her gloves and arm guards into the washer. She also estimated that it took her approximately 45 seconds to remove her gloves and arm guards from the washer and place them in the dryer. Approximately a quarter of the time, she washed her gloves and arm guards with her jeans. Gary Wirtz washed his gloves and arm guards with his other clothes.

---

[5] The parties agree that the relevant time period in this case is August 3, 2008, through March 31, 2011.

Local 442 never sought pay for time employees spent washing their gloves and arm guards in either their collective bargaining negotiations or by filing a subsequent grievance. Local 442 never complained that the washing service provided by Electrolux was inadequate in any way.

### B.    *Procedural Background*

On August 3, 2011, plaintiffs filed a "Class and Collective Action Complaint" raising claims for unpaid wages for donning activities under the FSLA and IWPCL. On September 13, 2011, plaintiffs filed an amended "Class and Collective Action Complaint," again raising claims for unpaid wages for donning activities under the FSLA and IWPCL. Specifically, plaintiffs seek back overtime pay for the time they spent donning PPE, including gloves, arm guards, and safety glasses, prior to the start of their shifts ("donning claim"). Plaintiffs also seek back overtime pay for the time they spent walking to their work stations after donning their PPE ("walking claims") and for the time they spent washing their gloves and arm guards at home ("washing claim"). Defendants AB Electrolux, and Electrolux Home Products, Inc., Electrolux Home Care Products North America, and Electrolux Home Care Products, Ltd. ("Electrolux") filed their answer and twenty-two affirmative defenses on October 7, 2011.

Both parties have now moved for partial summary judgment. In its motion, Electrolux seeks summary judgment on four parts of plaintiffs' lawsuit. First, Electrolux seeks summary judgment on plaintiffs' claims, under the FLSA, that they are entitled to overtime pay for the time they spent donning protective clothing and items prior to the start of their shifts. Electrolux argues that this time is non-compensable under § 203(o) of the FLSA, is *de minimis*, and is not integral and indispensable to any principal activities. Second, Electrolux seeks summary judgment on plaintiffs' FLSA claims that they are owed overtime pay for the time spent walking to their work stations after donning

PPE. Electrolux contends that this time is not compensable under the Portal-to-Portal Act. Electrolux also argues that this time is not compensable under the FLSA because the donning actions did not trigger the continuous workday. Alternatively, Electrolux argues that this time isn't compensable because it is *de minimis*. Third, Electrolux requests summary judgment on plaintiffs' FLSA claims for overtime pay for the time they spent washing their gloves and arm guards at home. Electrolux argues that this time is not compensable because this activity was not primarily for the benefit of Electrolux and because it is *de minimis*. Finally, Electrolux seeks summary judgment on plaintiffs' parallel claims under the IWPCL. Electrolux contends that plaintiffs' IWPCL claims fail as a matter of law because they are based on violations of the FLSA which plaintiffs are unable to substantiate. Plaintiffs contest each aspect of Electrolux's motion.

Plaintiffs seek partial summary judgment on certain affirmative defenses asserted by Electrolux. First, plaintiffs seek summary judgment on Electrolux's affirmative defense that § 301 of the Labor Management Relations Act controls ("Seventeenth Affirmative Defense"), and Electrolux's affirmative defense that plaintiffs' failure to follow and exhaust the grievance process outlined in the applicable collective bargaining agreement ("CBA") bars their claims ("Eighteenth Affirmative Defense"). Second, plaintiffs seek summary judgment on Electrolux's affirmative defense that plaintiffs' donning time is not compensable because employees' donning of safety equipment was not compensable time under the express terms of the CBA ("Sixth Affirmative Defense"). Third, plaintiffs seek summary judgment on Electrolux's affirmative defense that plaintiffs' donning activities are not compensable under the Portal-to-Portal Act, 29 U.S.C. § 254, because they are "preliminary" or "postliminary" to a principle activity ("Fifth Affirmative Defense"). Fourth, plaintiffs seek summary judgment on Electrolux's affirmative defense that the "*de minimis*" exception applies to plaintiffs' activities ("Fourth Affirmative Defense"). Finally, plaintiffs seek summary judgment on

Electrolux's "good faith" affirmative defense, in which Electrolux asserts that it acted in good faith, pursuant to 29 U.S.C. § 259, in conformity with Department of Labor regulations and interpretations of the FLSA ("Third Affirmative Defense"). Electrolux does not resist plaintiffs' motion with respect to its Third, Seventeenth, and Eighteenth Affirmative Defenses. Accordingly, plaintiffs' motion is granted as to Electrolux's Third, Seventeenth, and Eighteenth Affirmative Defenses and those affirmative defenses are dismissed. Electrolux resists the remaining portions of plaintiffs' motion.

## II.     LEGAL ANALYSIS

### A.     Summary Judgment Standards

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ––– U.S. ––––, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530

> U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*). Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006). I will apply these standards to the parties' motions for partial summary judgment.

### B.    Overview Of The FLSA

> The Fair Labor Standards Act, enacted in 1938, governs minimum wages and maximum hours for non-exempt "employees who in any workweek [are] engaged in commerce or in the production of goods for commerce, or [are] employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a) (minimum wages); § 207(a) (maximum hours); see § 213 (exemptions). The Act provides that "employee" generally means "any individual employed by an employer," § 203(e)(1), and, in turn, provides that to "employ" is "to suffer or permit to work," § 203(g).

*Sandifer v. United States Steel Corp.*, 134 S. Ct. 870, 875 (2014). Under the FLSA, employers must pay their employees overtime wages at "a rate not less than one and one-half times the regular rate at which [they are] employed" for hours worked in excess of

forty hours per week. 29 U.S.C. § 207(a)(1); *see Adair v. ConAgra Foods, Inc.*, 728 F.3d 849, 850 (8th Cir. 2013); *Specht v. City of Sioux Falls*, 639 F.3d 814, 820 (8th Cir. 2011); *Chao v. Barbeque Ventures, L.L.C.*, 547 F.3d 938, 942 (8th Cir. 2008); *see also Allen v. McWane, Inc.*, 593 F.3d 449, 453 (5th Cir. 2010); *Turner v. City of Philadelphia*, 262 F.3d 222, 224 (3d Cir. 2001). The FLSA, however, does not define the key terms "work," "workday," or "work week." *See Sandifer*, 134 S. Ct. at 875; *Adair*, 728 F.3d at 850; *Sepulveda v. Allen Family Foods, Inc.*, 591 F.3d 209, 213 (4th Cir. 2009). Nonetheless, work has been broadly construed to include "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944).

In 1947, provisions of the FLSA were amended by the Portal–to–Portal Act, 29 U.S.C. §§ 251–262.[6] *See Sandifer*, 134 S. Ct. at 875; *Adair*, 728 F.3d at 851. Section

---

[6] Congressional intent to reverse the United States Supreme Court's expansive interpretation of the FLSA is clear from the preamble to the Portal-to-Portal Act, which states:

> The Congress finds that the Fair Labor Standards Act of 1938 . . . has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, (1) the payment of such liabilities would bring about financial ruin of many employers and seriously impair the capital resources of many others, thereby resulting in the reduction of industrial operations, halting of expansion and development, curtailing employment, and the earning power of employees; (2) the credit of many employers

4 of that act excludes from the workday time spent "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which [an] employee is employed to perform," and time spent performing "activities which are preliminary to or postliminary to said principal activity or activities." 29 U.S.C. § 254(a). A "principal activity" is "an integral and indispensable part of the principal activities for which covered workmen are employed." *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956); *see also* 29 C.F.R. § 290.8(a) ("[I]n order for an activity to be a 'principal' activity, it need not be predominant in some way over all other activities engaged in by the employee in performing his job; rather, an employee may, for purposes of the Portal-to-Portal Act be engaged in several 'principal' activities during the workday. The 'principal' activities referred to in the statute are activities which the employee is 'employed to perform'; they do not include noncompensable 'walking, riding, or

---

would be seriously impaired; (3) there would be created both an extended and continuous uncertainty on the part of industry, both employer and employee, as to the financial condition of productive establishments and a gross inequality of competitive conditions between employers and between industries; (4) employees would receive windfall payments, including liquidated damages, of sums for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay; (5) there would occur the promotion of increasing demands for payment to employees for engaging in activities no compensation for which had been contemplated by either the employer or employee at the time they were engaged in; [and] (6) voluntary collective bargaining would be interfered with and industrial disputes between employees and employers and between employees and employees would be created. . . .

29 U.S.C. § 251(a).

traveling' of the type referred to in section 4 of the Act.") (footnotes omitted)). The Eighth Circuit Court of Appeals has instructed that:

> As a general matter, an employee's workday begins with the first "principal activity" of his employment, and ends with the last such activity. 29 C.F.R. § 790.6(b). For time spent performing a nonprincipal activity to count toward an employee's workweek, then, that activity must be performed between the first and last principal activities of the day.

*Adair*, 728 F.3d at 850-51.

In 1949, the FLSA was amended again with the addition of § 3(o). *See Sandifer*, 134 S. Ct. at 876; *Adair*, 728 F.3d at 851. Section 3(o) provides that in determining the hours for which an employee is employed, "there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to a particular employee." 29 U.S.C. § 203(o).

## C.    *Analysis Of Plaintiffs' Donning Claims*

### 1.    *Section § 203(o)*

Electrolux asserts that plaintiffs' donning claims are barred by § 203(o).[7] Plaintiffs contend that the PPE worn by plaintiffs are not "clothes" under § 203(o).[8] Plaintiffs also

---

[7] As I explained in *Guinan v. Boehringer Ingelheim Vetmedica, Inc.*, 803 F. Supp. 984 (N.D. Iowa 2011), § 203(o) is not an affirmative defense and plaintiffs bear the burden to prove that the time should not be excluded under § 203(o). *Id.* (citing *Salazar v. Butterball, L.L.C.*, 644 F.3d 1130, 1138–39 (10th Cir. 2011); *Franklin v. Kellogg Co.*, 619 F.3d 604, 612 (6th Cir. 2010); *Allen v. McWane, Inc.*, 593 F.3d 449, 458–59 (5th Cir. 2010); *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 955–59 (11th Cir. 2007); *Turner v. City of Philadelphia*, 262 F.3d 222, 226–27 (3d Cir. 2001)).

[8] Plaintiffs made this argument without the benefit of the *Sandifer* decision.

contend that a tacit agreement is insufficient to establish a custom or practice for the purposes of § 203(o).

Section 203(o) states:

> Hours Worked.--In determining for the purposes of sections 206 and 207 of this title the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee.

29 U.S.C. § 203(o). The Eighth Circuit Court of Appeals has instructed that:

> Section 203(o) applies to donning and doffing of protective gear at the beginning and end of each day if two conditions are met. First, these activities must constitute "changing clothes" within the meaning of the statute. Second, time spent on these activities must be excluded from the workday by the express terms of or the customs and practices under a bona fide collective bargaining agreement.

*Sepulveda*, 591 F.3d at 214; *see Anderson v. Cagle's Inc.*, 488 F.3d 945, 955–59 (11th Cir. 2007); *see also Andrako v. United States Steel, Corp.*, 632 F. Supp.2d 398, 406–07 (W.D. Pa. 2009); *Kassa v. Kerry, Inc.*, 487 F. Supp.2d 1063, 1065 (D. Minn. 2007).[9]

Earlier this year, the United States Supreme Court considered the meaning of "changing clothes" under § 203(o). *Sandifer*, 134 S. Ct. at 873-74. In *Sandifer*, steelworkers brought suit under the FLSA against U.S. Steel Corporation. *Id.* at 874. The steelworkers claimed that they were entitled to be paid for the time spent donning and doffing the required protective gear and to receive back pay for past time devoted to

---

[9]Even when changing clothes and washing are integral to an employee's principal activities and would otherwise be compensable, the parties to a collective bargaining agreement may opt out of payment for such activities. *See Sepulveda*, 591 F.3d at 213.

this purpose. The steelworkers asserted that U.S. Steel required them to wear all of the items "because of hazards regularly encountered in steel plants." *Id*. U.S. Steel moved for summary judgment. The district court granted the motion in part, on the issue of whether the donning/doffing time constituted "changing clothes," and denied it in part, on the issue of travel time between the locker room and the employees' workstations. *Id*. The Seventh Circuit Court of Appeals affirmed and the Supreme Court granted *certiorari* but only on the donning/doffing issue. *Id*. at 875.

Initially, the Court considered the definition of the term "clothes." The Court held that "clothes," as used in § 203(o), "denotes *items that are both designed and used to cover the body and are commonly regarded as articles of dress*." *Id*. at 876-77 (emphasis original). The Court further noted that:

> The statutory context makes clear that the "clothes" referred to are items that are integral to job performance; the donning and doffing of other items would create no claim to compensation under the Act, and hence no need for the § 203(o) exception. Moreover, even with respect to items that can be regarded as integral to job performance, our definition does not embrace the view, adopted by some Courts of Appeals, that "clothes" means essentially anything worn on the body—including accessories, tools, and so forth. *See, e.g., Salazar v. Butterball, LLC*, 644 F.3d 1130, 1139–1140 (C.A. 10 2011) ("clothes" are "items or garments worn by a person" and include "knife holders"). The construction we adopt today is considerably more contained. Many accessories—necklaces and knapsacks, for instance—are not "both designed and used to cover the body." Nor are tools "commonly regarded as articles of dress." Our definition leaves room for distinguishing between clothes and wearable items that are not clothes, such as some equipment and devices.

*Id*. at 878 (footnote omitted).

Applying this standard, the Court held that a flame-retardant jacket, pair of pants, and hood; a hardhat; a snood; wristlets; work gloves; leggings; and metatarsal boots all "clearly fit" its interpretation of clothes. *Id.* at 879. The Court explained:

> [T]hey are both designed and used to cover the body and are commonly regarded as articles of dress. That proposition is obvious with respect to the jacket, pants, hood, and gloves. The hardhat is simply a type of hat. The snood is basically a hood that also covers the neck and upper shoulder area; on the ski slopes, one might call it a "balaclava." The wristlets are essentially detached shirtsleeves. The leggings look much like traditional legwarmers, but with straps. And the metatarsal boots—more commonly known as "steel-toed" boots—are just a special kind of shoe.

*Id.* at 879-80. The Court contrasted these items from safety glasses, earplugs, and respirators, observing that: "Whereas glasses and earplugs may have a covering function, we do not believe that they are commonly regarded as articles of dress. And a respirator obviously falls short on both grounds." *Id.* at 880.

Having determined the meaning of "clothes," the Court went on to consider the meaning of "changing." *Id.* The Court concluded that the term "changing" was to be construed broadly, including time spent altering dress. The employees had argued that they were only adding protected gear to their clothes, not changing into new clothing. They claimed that "changing" meant only substituting clothes. Disagreeing, the Court observed:

> Although it is true that the normal meaning of "changing clothes" connotes substitution, the phrase is certainly able to have a different import. The term "changing" carried two common meanings at the time of § 203(o)'s enactment: to "substitute" and to "alter." *See, e.g.,* 2 Oxford English Dictionary 268 (defining "change," among other verb forms, as "to substitute another (or others) for, replace by another (or others)" and "[t]o make (a thing) other than it was; to render different, alter, modify, transmute"). We think that

despite the usual meaning of "changing clothes," the broader statutory context makes it plain that "time spent in changing clothes" includes time spent in altering dress.

The object of § 203(o) is to permit collective bargaining over the compensability of clothes-changing time and to promote the predictability achieved through mutually beneficial negotiation. There can be little predictability, and hence little meaningful negotiation, if "changing" means only "substituting." Whether one actually exchanges street clothes for work clothes or simply layers garments atop one another after arriving on the job site is often a matter of purely personal choice. That choice may be influenced by such happenstances and vagaries as what month it is, what styles are in vogue, what time the employee wakes up, what mode of transportation he uses, and so on. As the Fourth Circuit has put it, if the statute imposed a substitution requirement "compensation for putting on a company-issued shirt might turn on something as trivial as whether the employee did or did not take off the t-shirt he wore into work that day." *Sepulveda v. Allen Family Foods, Inc.*, 591 F.3d 209, 216 (2009). Where another reading is textually permissible, § 203(o) should not be read to allow workers to opt into or out of its coverage at random or at will.

*Id*. at 879.

Finally, the Court "doubt[ed]" that application of the *de minimis* doctrine could "properly be applied to the present case[,]" observing:

A *de minimis* doctrine does not fit comfortably within the statute at issue here, which, it can fairly be said, is all about trifles—the relatively insignificant periods of time in which employees wash up and put on various items of clothing needed for their jobs. Or to put it in the context of the present case, there is no more reason to *disregard* the minute or so necessary to put on glasses, earplugs, and respirators, than there is to *regard* the minute or so necessary to put on a snood. If the statute in question requires courts to select among

> trifles, *de minimis non curat lex* is not Latin for *close enough for government work*.

*Id*. at 880 (emphasis original). The Court concluded that the better approach was "whether the period at issue can, on the whole, be fairly characterized as 'time spent in changing clothes or washing.'" *Id*. at 881. According to the Court:

> If an employee devotes the vast majority of the time in question to putting on and off equipment or other non-clothes items (perhaps a diver's suit and tank) the entire period would not qualify as "time spent in changing clothes" under § 203 (o), even if some clothes items were donned and doffed as well. But if the vast majority of the time is spent in donning and doffing "clothes" as we have defined that term, the entire period qualifies, and the time spent putting on and off other items need not be subtracted.

*Id*.

## 2. *Does plaintiffs' conduct constitute changing clothes?*

As discussed above, § 203(o) applies to the donning of clothes at the beginning of the work day if two conditions are met. First, the employee's activities must constitute "changing clothes" under § 203(o). Second, the time spent on these activities "must be excluded from the workday by the express terms of or the customs and practices under a bona fide collective bargaining agreement." *Sepulveda*, 591 F.3d at 214; *see Anderson*, 488 F.3d at 955–59. Regarding the first requirement, Electrolux argues that the gloves, arm guards, aprons, earplugs, and safety glasses worn by plaintiffs are all clothes under § 203(o). The *Sandifer* decision is clearly controlling on this issue. Indeed, in *Sandifer,* the Supreme Court explicitly found both gloves and armguards constituted clothes.[10] *Sandifer*, 134 S. Ct. at 879. The aprons also clearly fall within the definition of clothes

---

[10]One of the PPE in *Sandifer* was "wristlets," which the Court described as "essentially detached shirtsleeves." *Sandifer*, 134 S. Ct. at 879. The arm guards here fall within that definition.

adopted in *Sandifer* because they are "designed and used to cover the body and are commonly regarded as articles of dress." *Id*. at 876. The Court also explicitly found that ear plugs and safety glasses "do not satisfy our standard." *Id*. at 880.

Because the PPE at issue here includes both clothes and non-clothes, the question is "whether the period at issue can, on the whole, be fairly characterized as 'time spent in changing clothes or washing.'" *Id*. at 881. Although none of the PPE items here individually required extensive time to don, the clothes items collectively required considerably more time to don than the non-clothes items. Ausborn estimated that it took him 2 minutes to put on his gloves and arm guards while it took employees approximately 30 seconds to put on an apron. In comparison, an employee needed approximately 30 seconds to put on in earplugs. Although the record is silent on the time required for an employee to don the safety glasses, from my examination of the exemplar in the summary judgment record, I would be surprised if it took more than 5 seconds to put them on. Thus, the time required by employees to don safety glasses and ear plugs was very minimal. Accordingly, I conclude that the vast majority of the time here was spent donning "clothes." Therefore, the entire period qualifies as time spent changing clothes under § 203(o). *See id*.

### 3. Custom or practice

The second requirement for § 203(o) to apply is that there was a custom or practice under Electrolux's CBA with Local 442 excluding time spent changing clothes. *See Sepulveda*, 591 F.3d at 214; *see Anderson*, 488 F.3d at 955–59. Electrolux contends that it was the custom and practice under the CBAs between Electrolux and Local 442 to exclude the donning of protective clothing and items from working time. Plaintiffs counter that § 203(o) must be narrowly construed and requires payment for clothes-

changing time to have been expressly raised and abandoned during negotiations over a CBA before a "custom or practice" for nonpayment for such time can be found to exist.[11]

The Eighth Circuit Court of Appeals has yet to address the meaning of "custom or practice" under § 203(o). Cases from other circuit courts of appeals, however, are instructive. In *Turner v. City of Philadelphia*, 262 F.3d 222 (3rd Cir. 2001), the Third Circuit Court of Appeals affirmed the granting of summary judgment on this issue, concluding that a custom or practice existed for the time employees spent changing clothes. The plaintiffs conceded that a custom or practice existed as to their not being paid for this time, but they argued that for the custom or practice to fall "under a bona fide collective-bargaining agreement," the issue had to be specifically raised in negotiations and "dropped" by the negotiators. *Id.* at 226. In other words, plaintiffs maintained that employees could not forfeit their FLSA right to compensation by failing to contest a 30–year old policy of non-compensation. Disagreeing, the district court granted summary judgment for the employer under § 203(o). *Id.* at 225. The court of appeals affirmed, explaining:

> [P]laintiffs interpret the phrase "custom or practice under a bona fide collective-bargaining agreement" too narrowly, placing undue emphasis on the clause "under a bona fide collective-bargaining agreement" while virtually reading the clause "custom or practice" out of § 203(o). In essence, plaintiffs construe [§ 203(o)] as "custom or practice established through formal collective bargaining negotiations." To the contrary, we view the phrase as simply restating the well-established principle of labor law that a particular custom or practice can become an implied term of

---

[11]Although plaintiffs ostensibly rely on the district court opinion in *Kassa v. Kerry, Inc.*, 487 F. Supp.2d 1063 (D. Minn. 2007), to support their argument, the quotation they use is not from the district court's opinion, but, is instead, drawn from a portion of the magistrate judge's report and recommendation which the district court declined to accept. *Id.* at 1068.

a labor agreement through a prolonged period of acquiescence. *See, e.g., Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,* 396 U.S. 142, 153–54, 90 S. Ct. 294, 24 L. Ed.2d 325 (1969); *Bonnell/Tredegar Indus., Inc. v. NLRB*, 46 F.3d 339, 344 (4th Cir. 1995); *Railway Labor Executives Ass'n v. Norfolk & Western Ry. Co.*, 833 F.2d 700, 705 (7th Cir. 1987); *Brotherhood of Maintenance of Way Employees v. Chicago & North Western Transp. Co.*, 827 F.2d 330, 334 (8th Cir. 1987).

*Id*. at 226.

The Fifth Circuit Court of Appeals reached the same conclusion in *Allen*, 593 F.3d at 457, holding that:

> [E]even when negotiations never included the issue of non-compensation for changing time, a policy of non-compensation for changing time that has been in effect for a prolonged period of time, and that was in effect at the time a CBA was executed, satisfies § 203(o)'s requirement of 'a custom or practice under a bona fide' CBA. . . . In such instances, regardless of whether the parties negotiated regarding compensation for changing time, acquiescence of the employees may be inferred.

*Allen*, 593 F.3d at 457. Likewise, in *Franklin*, the Sixth Circuit Court of Appeals rejected the plaintiffs' argument that in order for an employer to rely on § 203(o), that employer was required to show that the union or employees knew that they were entitled to payment for donning or doffing time but nonetheless negotiated CBAs without proposing any change to the practice. *Franklin*, 619 F.3d at 616. Instead, based on the employer's longstanding policy of not paying for time donning uniforms or gear and the union knowledge of that fact while negotiating several CBAs, the court of appeals held that this constituted "a custom or practice of nonpayment for time spent changing clothes under a bona fide CBA. . . . Accordingly, the time spent donning and doffing the equipment is excluded from 'hours worked' under § 203(o)." *Id*. at 618.

Finally, in *Anderson,* current and former employees of a chicken processing facility brought claims for alleged violations of the FLSA. *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 949 (11th Cir. 2007). The employer moved for summary judgment arguing, *inter alia*, that § 203(o) barred the employees' claims for time spent changing clothes. The district court granted the motion, and the Eleventh Circuit Court of Appeals affirmed. *Id.* The court of appeals found that a § 203(o) custom and practice existed under the collective bargaining agreement at issue. Id. at 959. The court of appeals concluded that:

> Relying again on a common sense understanding of the statute's language, we believe that a policy concerning compensation (or noncompensation, as the case may be) for clothes changing, written or unwritten, in force or effect at the time a CBA was executed satisfies § 203(o)'s requirement of a "custom or practice under a bona fide" CBA.

*Id.* The court of appeals further explained that the "[a]bsence of negotiations cannot in this instance equate to ignorance of the policy. Rather, it demonstrates acquiescence to it." *Id.*

Here, the uncontroverted record establishes that CBAs between Local 442 and Electrolux existed for 50 years. Local 442 was fully aware of Electrolux's consistent practice, for over thirty years, of not paying its employees for the time spent putting on PPE, including, but not limited to, gloves, arm guards, and safety glasses. There is no indication whatsoever that anyone ever challenged the policy of nonpayment. To the contrary, the record reveals acquiescence to this practice. Under these circumstances, I find that there was a "custom or practice under a bona fide collective-bargaining agreement" of non-payment for donning time, triggering application of § 203(o). Thus, donning time is excluded by § 203(o) from the hours worked by plaintiffs and Electrolux did not violate the FLSA by failing to compensate plaintiffs for donning time.

Accordingly, this portion of Electrolux's Motion For Partial Summary Judgment is granted.

### D. Analysis Of Plaintiffs' Walking Claims

Electrolux also seeks summary judgment on plaintiffs' claims for time spent walking to their work stations after donning their PPE. Electrolux argues that this time is not compensable under the Portal-to-Portal Act. Electrolux further argues that it is not compensable under the FLSA because the donning actions did not trigger the continuous workday. Electrolux also argues that this time isn't compensable because it is *de minimis*.

Generally, an employee's workday begins with the first "principal activity" the employee performs and ends with the last "principal activity" that employee performs. *See* 29 U.S.C. §254(a)(1); *Adair*, 728 F.3d at 850-51 (citing 29 C.F.R. § 790.6(b)). "For time spent performing a nonprincipal activity to count toward an employee's workweek, then, that activity must be performed between the first and last principal activities of the day." *Adair*, 728 F.3d at 851. In *Steiner*, 350 U.S. 252–53, the United States Supreme Court held that "principal activity or activities" included all activities that are an "integral and indispensable part of the principal activities" for which the employee is employed. *Id.; see IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005) ("[W]e hold that any activity that is 'integral and indispensable' to a 'principal activity is itself a 'principal activity' under § 4(a) of the Portal-to-Portal Act."); *Adair*, 728 F.3d at 852 (noting that both *Steiner* and *Alvarez* recognized that "an activity that is 'integral and indispensable to a principal activity is itself a principal activity.'") (quoting *Alvarez*, 546 U.S. at 37)(internal quotations omitted)).

The Portal–to–Portal Act exempts from the wage provisions of the FLSA "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." 29 U.S.C. § 254(a);

*see Sandifer v. United States Steel Corp.*, 678 F.3d 590, 596 (7th Cir. 2012), *aff'd on other grounds*, 134 S. Ct. 870 (2014). Nonetheless, "[i]f an employer requires his employees to don and doff work clothes at the workplace, then donning and doffing are an integral and indispensable part of the workers' main activity and therefore a principal activity." *Sandifer*, 678 F.3d at 596 (citing *Steiner*, 350 U.S. at 256). However, the Eighth Circuit Court of Appeals has explained that, where clothes changing time is excluded by custom or practice under a CBA,

> the hours spent changing clothes are not "hours for which an employee is employed." 29 U.S.C. § 203(o). Reading § 254(a) and § 203(o) together thus leads to the conclusion that the changing of clothes is not a principal activity that begins and ends the workday, because it is not an activity the employee is employed to perform.

*Adair*, 728 F.3d at 852; *see Sandifer*, 678 F.3d at 596 (noting that "[s]ection 203(o) permits the parties to a collective bargaining agreement to reclassify changing time as nonworking time, and they did so, agreeing that the workday would not start when the workers changed their clothes; it would start when they arrived at their work site.").

In support of its position, plaintiffs rely on a June 16, 2010, United States Department of Labor opinion letter advising, *inter alia*, that an activity excluded from the workday under § 203(o) can constitute a principal activity. *See* Wage & Hour Div., U.S. Dep't of Labor, Opinion Letter, 2010 WL 2468195 ("2010 Opinion Letter"). The United States Supreme Court has instructed that, although not controlling, administrative rulings, interpretations, and opinions may be entitled to some deference by reviewing courts. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power

to control." *Id.* In *Adair*, the Eighth Circuit Court of Appeals specifically rejected the 2010 Opinion Letter, observing:

> We acknowledge the Department of Labor's current position that an activity excluded from the workday under § 203(o) can constitute a principal activity, but we deem it unpersuasive. *See* U.S. Dep't of Labor, Opinion Letter, 2010 WL 2468195, at 4 (June 16, 2010). The Department's views on whether excluded activities can be principal activities have changed with the vicissitudes of electoral winds, with no reference to its experience or expertise in the matter. *Compare id.*, with U.S. Dep't of Labor, Opinion Letter, 2007 WL 2066454, at 1 (May 14, 2007). Given this inconsistency, the Department's position is "entitled to considerably less deference than a consistently held agency view." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S. Ct. 1207, 94 L. Ed.2d 434 (1987) (internal quotation omitted). Indeed, for this reason, all but one court of appeals to consider the Department's positions in this and similar contexts have decided not to defer to the "gyrating agency letters on the subject." *Sepulveda v. Allen Family Foods, Inc.*, 591 F.3d 209, 216 n. 3 (4th Cir. 2009); *see Sandifer*, 678 F.3d at 599; *Salazar v. Butterball, LLC*, 644 F.3d 1130, 1139 (10th Cir. 2011); *Franklin,* 619 F.3d at 612–14; *Alvarez v. IBP, Inc.*, 339 F.3d 894, 905 n. 9 (9th Cir. 2003). *But see Anderson v. Cagle's Inc.*, 488 F.3d 945, 956–57 (11th Cir. 2007).

*Adair*, 728 F.3d at 853; *see Sandifer*, 678 F.3d at 599 (noting that "[i]t would be a considerable paradox if before 2001 the plaintiffs would win because the President was a Democrat, between 2001 and 2009 the defendant would win because the President was a Republican, and in 2012 the plaintiffs would win because the President is again a Democrat. That would make a travesty of the principle of deference to interpretations of statutes by the agencies responsible for enforcing them, since that principle is based on a belief either that agencies have useful knowledge that can aid a court or that they are delegates of Congress charged with interpreting and applying their organic statutes

consistently with legislative purpose.") (citation omitted). I, too, decline to give deference to the 2010 Opinion Letter. Because the Department of Labor has repeatedly altered its interpretation of § 203(o), the persuasive power of its interpretation is greatly diminished. *See Adair*, 728 F.3d at 853; *Sandifer*, 678 F.3d at 599; *see also Salazar v. Butterball, L.L.C.*, 644 F.3d 1130, 1139 (10th Cir. 2011) ("Where, as here, an agency repeatedly alters its interpretation of a statute, the persuasive power of those interpretations is diminished."); *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1205 n.3 (10th Cir. 2004) ("An agency interpretation that conflicts with the agency's earlier interpretation is. . .entitled to considerably less deference than a consistently held position.").

In *Adair*, the Eighth Circuit Court of Appeals concluded that the time employees spent donning and doffing their uniforms was excluded by § 203(o) from the hours they were employed. *Adair*, 728 F.3d at 852. Based on this conclusion, the court of appeals held that:

> donning and doffing is not an activity that the laborers are employed to perform, and it is therefore not a principal activity that begins and ends the workday. It follows that time spent walking between the clothes-changing stations and the time clock is not part of the workday and workweek for which the employer is liable to pay overtime compensation under the Act.

*Id.* at 853; *see Sandifer*, 678 F.3d at 596-97 (observing that "[i]f clothes-changing time is lawfully not compensated, we can't see how it could be thought a principal employment activity, and so section 254(a) exempts the travel time in this case.").

Likewise, here, having found that the time plaintiffs spent donning their clothes is excluded by § 203(o) from the hours they are employed, their donning is not an activity they are employed to perform, and it is, therefore, not a principal activity that begins and ends the workday. Thus, the time plaintiffs spent walking to their work stations after

donning their PPE is not part of the workday and workweek for which Electrolux is liable to pay overtime compensation under the FLSA. Accordingly, this portion of Electrolux's Motion For Partial Summary Judgment is also granted.

### E.    Analysis Of Plaintiffs' Washing Claims

Electrolux also seeks summary judgment on plaintiffs' claims for the time they spent washing their gloves and arm guards at home. Electrolux argues that this time is not compensable because this activity was not primarily for the benefit of Electrolux and because it is *de minimis*.

#### 1.    Legal framework

The term "washing," as used in § 203(o), has not been construed to include washing clothes. *See In re Tyson Foods, Inc.*, 694 F. Supp.2d 1358, 1366 n.1 (M.D. Ga. 2010) ("Since the term 'washing' as used in § 203(o) 'is limited to washing one's body and does not include the cleaning and sanitizing of protective clothing,' the Court finds that time spent sanitizing safety and sanitary gear, including gloves, cannot be excluded under § 203(o)."); *Arnold v. Schreiber Foods, Inc.*, 690 F.Supp.2d 672, 686 (M.D. Tenn. 2010) ("The vast majority of courts to address the issue have held that § 203(o) only covers time spent by an employee washing his or her body, not his or her work equipment."); *Burks v. Equity Group–Eufaula Div.*, LLC, 571 F. Supp.2d 1235, 1243–1244 (M.D. Ala. 2008) (noting that "the vast majority of cases that have specifically discussed 'washing' in the context of § 203(o) have done so only in the context of washing one's body" and "the legislative history of 203(o) indicates that the term 'washing' was intended to be limited to cleaning the person"); *Saunders v. John Morrell & Co.*, No. C88–4143, 1991 WL 529542, at *4 (N.D. Iowa Dec.24, 1991) (same). *But see Sepulveda*, 591 F.3d at 216 n.4 (rejecting argument that "washing" did not cover employees' washing of their clothes and noting that "[l]ike the word 'clothes,'

the word 'washing' is not qualified. We see no reason, therefore, to treat 'washing' differently than 'clothes.' The basic problem with the employees' complaint is that it seeks to qualify the words 'washing' and 'clothes,' but the statute simply does not read that way."). The FLSA also generally precludes compensation for activities that are "preliminary" or "postliminary" to the "principal activity or activities" that the employee "is employed to perform." 29 U.S.C. § 254(a)(2); *see Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 144-45 (2nd Cir. 2012); *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 174 (7th Cir. 2011). However, the Supreme Court has instructed that preliminary or postliminary activities are compensable if it is "an integral and indispensable part of the principal activities." *Steiner*, 350 U.S. at 256 (holding that changing clothes and showering were "integral and indispensable" to producing batteries); *Lopez v. Tyson Foods, Inc.*, 690 F.3d 869, 874 (8th Cir. 2010) ("'[A]ctivities performed either before or after the regular work shift, on or off the production line, are compensable . . . . if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by [29 U.S.C. § 254(a)(1) ].'") (quoting *Steiner*, 350 U.S. at 256).

The Supreme Court has also noted that "the fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are integral and indispensable to a principal activity under *Steiner*." *Alvarez*, 546 U.S. at 39 (internal quotations omitted). Courts, however, do not view these two terms as synonymous. *See Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 592 (2nd Cir. 2007); *Goldstein v. Children's Hosp. of Philadelphia*, Civil Action No. 10-1190, 2013 WL 664174, at *2 (E.D. Pa. Feb. 25, 2013); *Edwards v. City of New York*, No. 08 Civ. 3134(DLC), 2011 WL 3837130, at *7 (S.D.NY. Aug. 29, 2011); *Musticchi v. City of Little Rock, Arkansas*, 734 F. Supp.2d 621, 631 (E.D. Ark. 2010). In *Musticchi*, 734 F. Supp.2d at 631, the court pointed out that:

The Second Circuit has recognized that "indispensable is not synonymous with integral. Indispensable means necessary . . . . Integral means, inter alia, essential to completeness; organically joined or linked composed of constitutes parts making a whole." *Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 592 (2d Cir. 2007) (internal quotations and citations omitted). The court added that "[s]harpening the knife is integral to carving a carcass, *Mitchell v. King Packing Co.*, 350 U.S. 260, 263, 76 S. Ct. 337, 100 L. Ed. 282 (1956); powering up and testing an x-ray machine is integral to taking x-rays, *Kosakow v. New Rochelle Radiology Assocs., P. C.*, 274 F.3d 707 (2d Cir. 2001); and feeding, training and walking the dog is integral to the work of a K–9 officer, *Reich v. N.Y. City Transit Auth.*, 45 F.3d 646 (2d Cir. 1995)." *Id.* Relying on *Gorman*, the Ninth Circuit in *Bamonte* stated that if "an activity is indispensable [it] does not necessarily mean that the activity is integral to the work performed." *Bamonte [v. City of Mesa]*, 598 F.3d [1217,] 1232 [(9th Cir. 2010)]. Thus, if an activity is not essential to complete the employee's principal task the employee is not entitled to compensation for the activity pursuant to the Portal–to–Portal Act.

*Id.*

Thus, Electrolux will prevail on this part of its summary judgment motion if plaintiffs' washing actions constitute "preliminary or postliminary" activities, under § 254(a)(2), which are not indispensable and integral to Electrolux's production of appliances. *See Steiner*, 350 U.S. at 256; *Lopez*, 690 F.3d at 874. Federal courts have considered the following three factors in determining whether preliminary or postliminary activities are integral and indispensable: (1) whether the activity is required by the employer, (2) whether the activity is necessary for the employee to perform his or her job duties, and (3) whether the activity primarily benefits the employer. *See Franklin v. Kellogg Co.*, 619 F.3d 604, 620 (6th Cir. 2010); *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1344 (11th Cir. 2007); *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901,

910–12 (9th Cir. 2004); *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 400-01 (5th Cir. 1976); *Holmert v. Butterball, L.L.C.*, 805 F. Supp.2d 655, 659 (E.D. Ark. 2011); *Jerzak v. City of South Bend*, 996 F. Supp. 840, 848 (N.D. Ind. 1998). I will consider each of these requirements in turn.

### 2.       Whether the activities were required by Electrolux

Initially, I find that plaintiffs' cleaning of their gloves and arm guards was not required by Electrolux. After a grievance was filed, in July 2007, over whether or not Electrolux should be washing gloves and arm guards for employees, Electrolux provided a cleaning service to wash the gloves and arm guards for employees. If employees wanted their gloves and arm guards washed, they could turn in their dirty gloves and arm guards, and pick up washed gloves and arm guards at the plant. Thus, while some employees continued to wash their gloves and arm guards at their homes, these actions were not required by Electrolux.

### 3.       Whether the activities were necessary for the employee to perform his or her duties

The next question I must determine is whether plaintiffs' washing of their gloves and arm guards was "necessary" for the employee to perform his or her duties. In *Musticchi,* the court held that the time police officers spent "polishing shoes, boots and duty belts, cleaning radios and traffic vests and oiling handcuffs are preliminary and postliminary activities and not compensable under the Portal–to–Portal Act." *Musticchi,* 734 F.Supp.2d at 631. The court reasoned that "[w]hile polishing and cleaning may be a necessary or an indispensable component of being a [police] officer, unlike a butcher sharpening a knife or an x-ray technician powering and testing an x-ray machine, [police] officers can successfully perform their jobs without polishing and cleaning their uniform and equipment." *Id*. Likewise here, plaintiffs can perform their duties without regard to the cleanliness of their gloves and arm guards. Obviously, if there was a correlation

between the cleanliness of employees' gloves and arm guards and their ability to perform their duties, Electrolux would have adopted rules regarding the cleanliness of employees' gloves and arm guards. Electrolux, however, never required employees to wash their gloves or arm guards, or to keep them at any particular level of cleanliness. Finally, the employees' own actions demonstrate that the cleaning of their gloves and arm guards was not "necessary" for them to perform their duties, since the time and frequency they spent doing so varied dramatically from employee to employee.

To support their claim, plaintiffs cite *Bull v. United States*, 68 Fed. Cl. 212 (Fed. Cl. 2005). *Bull* is readily distinguishable from this case.[12] In *Bull*, the court held, *inter alia*, that off-duty laundering of canine training towels was of benefit to the employer and integral and indispensable to the canine handlers' job duties. *Id*. at 239. However, unlike the situation here, in *Bull s*pecific portions of an employee handbook and a written memo established that the canine training towels were required to be properly cleaned "after each use" because clean towels were an integral part of training a dog to detect contraband. *Id*. Thus, I conclude that plaintiffs' washing of their gloves and arm guards was not necessary for them to perform their duties.

### 4.    *Whether the activities primarily benefit Electrolux*

The final factor is whether plaintiffs' cleaning of their gloves and arm guards primarily benefits Electrolux. Because the summary judgment record does not establish any correlation between the cleanliness of employees' gloves and arm guards and the plaintiffs' ability to perform their duties, I find that plaintiffs' cleaning of their gloves and arm guards does not primarily benefit Electrolux.

---

[12] Another case cited by plaintiffs, *Rojas v. Marko Zaninovich, Inc.*, No. 1:09-CV-00705, 2012 WL 439398, at *21-22 (E.D. Cal. Feb. 9, 2001), is also distinguishable from this case. In *Rojas*, brought under the Agriculture Workers Protection Act, 29 U.S.C. § 1801 *et seq.*, the court's analysis focused on whether time spent washing trays at home was *de minimis*. *Id*.

Having concluded that plaintiffs' cleaning of their gloves and arm guards was not required by Electrolux, was not necessary for the employees to perform their duties, and does not primarily benefit Electrolux, plaintiffs' washing actions are excluded from coverage as "preliminary or postliminary" activities, under § 254(a)(2), which are not indispensable and integral to Electrolux's production of appliances. Accordingly, this portion of Electrolux's Motion For Partial Summary Judgment is also granted.

### F.    Analysis Of Plaintiffs' IWPCL Claims

Electrolux further seek summary judgment on plaintiffs' IWPCL claims. Electrolux argues that, because plaintiffs' IWPCL claims are duplicative of their FSLA claims, their IWPCL claims fail for the same reasons as their FSLA claims. Plaintiffs assert that their IWPCL claims are not preempted by their FSLA claims and this portion of Electrolux's motion should be denied. I begin my analysis with an overview of the IWPCL.

### 1.    Overview of the IWPCL

As I previously recognized:

> The IWPCL is a "remedial statute," and "meant to facilitate the public policy of allowing employees to collect wages owed to them by their employers." *Hornby v. State*, 559 N.W.2d 23, 26 (Iowa 1997). Section 91A.3 gives employees the right to receive their wages. It states, "An employer shall pay all wages due its employees. . . ." Iowa Code § 91A.3. The IWPCL also gives employees the right to receive their "wages due" in "at least monthly, semimonthly, or biweekly installments on regular paydays," *id.*, and provides suspended or terminated employees with the right to receive their "wages earned" by "the next regular payday," *id.* § 91A.4. The FLSA, of course, provides similar rights, like the rights to a minimum wage and overtime pay. 29 U.S.C. §§ 206, 207. A big difference between the FLSA and IWPCL is that the IWPCL is more concerned with when

or how wages are paid. *See Runyon v. Kubota Tractor Corp.*, 653 N.W.2d 582, 585 (Iowa 2002) ("We have observed that the purpose of chapter 91A is to 'facilitate collection of wages by employees.'" (quoting *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 593 (Iowa 1999))). Nevertheless, both statutes require employers to pay certain wages to their employees. *See Stahl v. Big Lots Stores, Inc.*, No. 06–CV–1026–LRR, 2007 WL 3376707, at *5 (N.D. Iowa Nov. 7, 2007) ("The purpose of the FLSA and the IWPCL is to 'facilitate the collection of wages owed to employees.'" (quoting *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 201 (Iowa 1997))). While the FLSA prescribes exactly what kind of wages must be paid, *see* 29 U.S.C. §§ 206, 207, the IWPCL simply requires that an employer "pay all wages due its employees," Iowa Code § 91A.3. Thus, the FLSA may be used to establish an employee's right to a certain amount of wages under the IWPCL and an employer's violation of the IWPCL for not paying "all wages due its employees." *Id.*

*Bouaphakeo v. Tyson Foods*, 564 F. Supp.2d 870, 883 (N.D. Iowa 2008).

### 2. Analysis

Here, plaintiffs rely on the FLSA for establishing their right to a certain amount of wages under the IWPCL and assert that Electrolux violated the IWPCL by not paying these wages to them. Because FLSA violations are the predicate for plaintiffs' alleged IWCPA violations, and I have found no FSLA violations with respect to plaintiffs' donning, walking, and washing claims, plaintiffs' IWPCL claims also fail. Therefore, this portion of Electrolux's Motion For Partial Summary Judgment is also granted.

Having granted Electrolux's Motion for Partial Summary Judgment on all claims, I need not decide the remaining portions of plaintiffs' Motion For Partial Summary Judgment on Electrolux's affirmative defenses, and the remainder of that motion is denied as moot.

### III.    CONCLUSION

For the reasons discussed above, Electrolux did not violate either the FLSA or the IWPCL by failing to compensate plaintiffs for the time they spent donning PPE, walking to their work stations after donning their PPE, and washing their gloves and arm guards at home.  Accordingly, Electrolux's Motion For Partial Summary Judgment is granted with respect to all of the named plaintiffs' claims only.  Electrolux has not moved for summary judgment on the claims of the putative class members and those claims accordingly remain pending.  Plaintiffs' Motion For Partial Summary Judgment is granted as to Electrolux's Third, Seventeenth, and Eighteenth Affirmative Defenses and those affirmative defenses are dismissed.   The remaining portions of plaintiffs' motion are denied as moot.  The parties shall file a status report or motion regarding disposition of the claims of the putative class on or before April 28, 2014.

**IT IS SO ORDERED**.

**DATED** this 28th day of March, 2013.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA